119 P.3d 169 (2005)
2005-NMCA-112
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff-Appellee,
v.
Naomi LUEBBERS, individually, and as Mother, Guardian, and Next Friend of Brian Salazar, Jr., a minor, Defendants-Appellants.
No. 23,556.
Court of Appeals of New Mexico.
June 14, 2005.
Certiorari Granted August 26, 2005.
*171 Rudolph A. Lucero, Ruth Fuess, Miller Stratvert PA, Albuquerque, NM, for Appellee.
Geoffrey R. Romero, Law Offices of Geoffrey R. Romero, Albuquerque, NM, for Appellants.
Certiorari Granted, No. 29,385, August 26, 2005.

OPINION
BUSTAMANTE, Chief Judge.
{1} Naomi Luebbers (Luebbers) presented a claim to State Farm Mutual Insurance Company (State Farm) on behalf of her minor son, Brian Salazar, Jr. for uninsured motorist benefits, alleging that Brian Jr. sustained loss of consortium damages as a result of the shooting death of his Father by or with the complicity of the operator of an uninsured motor vehicle. State Farm sought a declaratory judgment that its insurance policies did not provide coverage for Luebbers' claims. In a motion for summary judgment, State Farm argued (1) Brian Jr. did not qualify as an insured under the policy because, as a four-week-old fetus at the time of the shooting, he was not a viable person; (2) under the policies, bodily injury triggering coverage must be to an insured, and Father was not an insured under its policies; and (3) Brian Jr. had no cause of action available to him since there is no New Mexico precedent allowing recovery for loss of parental consortium outside of a wrongful death act proceeding.
{2} The district court granted State Farm's motion for summary judgment. We reverse.

FACTUAL BACKGROUND
{3} Brian Salazar, Sr. (Father) was shot and killed in November 1996 by an unidentified person shooting from a moving vehicle. Before being shot, Father argued with the occupants of a blue truck. Father and the driver of the blue truck engaged in a fistfight while stopped at a red light. The fight ended when the passenger of the blue truck fired a gunshot into the air. The two vehicles continued down the street and Father was hit by a shot fired through his windshield. It is currently unknown who actually fired the gun.
{4} On the day of the shooting, Luebbers was approximately four weeks pregnant with Father's son, Brian Jr. Luebbers lived with her mother and stepfather, Kathleen and *172 Edward O'Brien, and was a member of their household. There were two insurance policies issued by State Farm in force providing uninsured motorist coverage to members of the O'Brien household. Brian Jr. was born on July 8, 1997, and continued to reside with his mother in the O'Brien household until September 2001. Father was not a member of the O'Brien household at the time of the shooting.
{5} Slightly reorganized from their argument, the parties briefed the following issues:
1. Does the provision of the State Farm policy limiting coverage for loss of consortium claims to damages caused by "bodily injury to an insured" comply with New Mexico's uninsured motorist statute, NMSA 1978, § 66-5-301 (1983)?
2. Can Brian Jr. be deemed an insured under the policy where the event causing his injury occurred when he was a four-week-old fetus?
3. Is loss of consortium of a parent available to Brian Jr. as a cause of action separate from a wrongful death claim?
4. Was the shooting death of Father an accident within the requirements of the insurance policy?
{6} The first three issues present pure questions of law. As such, we apply a de novo standard of review. Cooper v. Chevron USA, Inc., 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61 ("The meaning of language used in a statute is a question of law that we review de novo."); Envtl. Control, Inc. v. City of Santa Fe, 2002-NMCA-003, ¶ 14, 131 N.M. 450, 38 P.3d 891 ("Whether ambiguity exists [in a contract] is a question of law; therefore, this Court reviews the district court's decision de novo.").
{7} State Farm did not raise issue number four in its own motion for summary judgment, but instead argued it in response to Luebbers' motion for summary judgment. The language of the order granting State Farm's motion for summary judgment does not indicate that this issue was decided or played a role in the district court's decision. If anything, the record indicates that the district court did not decide the issue since it denied Luebbers' motion for summary judgment which initially raised it. Given the posture of the record, we believe the issue is not ripe for review and is subject to renewal and consideration on remand. Thus, we will not address this issue.

1. Does the provision of the State Farm policy limiting coverage for loss of consortium claims to damages caused by "bodily injury to an insured" comply with New Mexico's uninsured motorist statute, NMSA 1978, § 66-5-301 (1983)?
{8} State Farm argues that the general insuring provision of its insurance policy plainly requires that bodily injury be sustained by an insured before any coverage provision applies. It is undisputed that Father was not an insured under the State Farm policy. Luebbers argues that the policy has conflicting language both granting and limiting coverage and, therefore, is ambiguous. In addition, Luebbers argues that if the policy does exclude coverage for the damages sustained by Brian Jr., the uninsured motorist insurance statute bars that exclusion. See § 66-5-301.

The policy is not ambiguous and requires bodily injury to an insured.
{9} "In order to determine coverage, we initially look to the language of the policy itself." Gonzales v. Allstate Ins. Co., 122 N.M. 137, 139, 921 P.2d 944, 946 (1996). If an insurance policy is found to be reasonably susceptible to different interpretations, "the contract is construed against the insurance company which drafted the clause." Lopez v. Found. Reserve Ins. Co., 98 N.M. 166, 168, 646 P.2d 1230, 1232 (1982), modified on other grounds by Montano v. Allstate Indem. Co., 2004-NMSC-020, 135 N.M. 681, 92 P.3d 1255. However,
[i]f the words of an insurance policy can reasonably be given their plain, ordinary, and popular meaning, the provisions should be applied as written, and the parties should be bound to the agreement into which they entered. This court cannot strain or torture the language of an insurance policy to create an ambiguity.
*173 Gonzales, 122 N.M. at 141, 921 P.2d at 948 (internal quotation marks and citation omitted).
{10} State Farm relies on language in Section III  "Uninsured and Unknown Motorists" on page twelve of the policy which states:
We will pay damages for bodily injury or property damage an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The bodily injury must be sustained by an insured and the bodily injury or property damage must be caused by accident arising out of the ownership, maintenance or use of an uninsured motor vehicle.

Luebbers also relies on this policy language, arguing that this portion of the policy refers to direct bodily injuries to an insured but does not address consequential damages such as loss of consortium. These types of claims and damages are covered, Luebbers asserts, under the "Limits of Liability" section on page thirteen of the policy:
Bodily injury
The amount of coverage is shown on the declarations page under "Limits of Liability  U  Each Person, Each Accident." Under "Each Person" is the amount of coverage for all damages due to bodily injury to one person. "Bodily injury to one person" includes all injury and damages to others resulting from this bodily injury. Under "Each Accident" is the total amount of coverage, subject to the amount shown under "Each Person", for all damages due to bodily injury to two or more persons in the same accident.
{11} Luebbers argues that the two paragraphs are in conflict since the second paragraph specifically recognizes payment for damages claims to non-injured insureds resulting from a bodily injury, while the first paragraph limits claims to those losses sustained by an insured suffering bodily injury. Luebbers claims that this conflict creates an ambiguity. In response, State Farm argues that the first paragraph quoted above is the general insuring provision, which sets forth the general limits of coverage. According to State Farm, if the general insuring provision does not provide coverage, there is no coverage.
{12} We perceive no ambiguity in this policy. The Limits of Liability language makes clear that the per-person/per-accident limits cover all damages flowing from bodily injury to insureds, including derivative claims such as loss of consortium. Further, coverage for "hit and run" drivers as a specie of uninsured motorist requires that the unknown motor vehicle cause "bodily injury to an insured." The definition of "insured" for uninsured coverage includes "any person entitled to recover damages because of bodily injury to an insured." It is clear that State Farm sought to require bodily injury to an insured before coverage for any claims would be triggered. State Farm expressed its desire in language which cannot be interpreted by a reasonable insured in another way. See Computer Corner, Inc. v. Fireman's Fund Ins. Co., 2002-NMCA-054, ¶ 13, 132 N.M. 264, 46 P.3d 1264 (emphasizing that insurance contract language should be interpreted to reflect the "understanding that a non-lawyer insured could derive from the ... policy").
{13} In order to prevail in a claim under the language of the policy, Brian Jr. must demonstrate bodily injury to an insured. Father was not an insured under the policy, so his bodily injury cannot constitute bodily injury to an "insured." Assuming that Brian Jr. is an insured, he would have to demonstrate his own bodily injury in order to meet the terms of the policy. However, New Mexico case law has made clear that the emotional distress suffered because of loss of consortium is not "bodily injury" within the meaning of an insurance policy provision providing for "bodily injury, sickness, disease or death." Gonzales, 122 N.M. at 140, 921 P.2d at 947 (internal quotation marks omitted). Thus, Brian Jr.'s loss of consortium injury does not fit the "bodily injury to an insured" required for coverage by the policy.

Is the requirement by State Farm that bodily injury must be sustained by an insured barred by the Uninsured Motorist Insurance Act?
{14} The uninsured motorist act, Section 66-5-301(A), mandates coverage "for the *174 protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death." There is no indication in the statute that bodily injury must be to an insured in order to obtain this mandated protection. New Mexico courts interpreting the uninsured motorist statute have held that the statute must be "liberally construed to implement the purpose of compensating those injured through no fault of their own.... [T]he only limitations on protection are those specifically set out in the statute itself: that the insured be legally entitled to recover damages and that the negligent driver be uninsured." Schmick v. State Farm Mut. Auto. Ins. Co., 103 N.M. 216, 219, 704 P.2d 1092, 1095 (1985) (citation omitted).
{15} "[A]ny provision allowing for an exception to uninsured coverage is strictly construed to protect the insured." Phoenix Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶ 7, 129 N.M. 395, 9 P.3d 639; Romero v. Dairyland Ins. Co., 111 N.M. 154, 156, 803 P.2d 243, 245 (1990). "We look to the terms of the insurance statutes to determine what is required, and then to the terms of the insurance policy to discern whether it complies with the mandatory law." Gonzales, 122 N.M. at 142, 921 P.2d at 949. "[E]xclusionary [provisions] in insurance contracts shall be enforced so long as their meaning is clear and they do not conflict with statutory law. But when an insurance provision does conflict with a statute, it is void." Chavez v. State Farm Mut. Auto. Ins. Co., 87 N.M. 327, 329, 533 P.2d 100, 102 (1975) (internal quotation marks and citation omitted) (second alteration in original).
{16} Relying on legislative intent and the public policy concerns embedded in the uninsured motorist statute, our courts have found various exclusionary provisions in uninsured motorist policies invalid. For example, in Chavez, the Court found a clause limiting recovery for uninsured motorist coverage to an insured while riding in an insured vehicle invalid, "because it [was] not the intent of the statute to limit coverage for an insured to a particular location or a particular vehicle." Id. at 330, 533 P.2d at 103. In Lopez, 98 N.M. at 169, 646 P.2d at 1233, the Court found a policy exclusion on stacking uninsured motorist policies invalid because the legislative intent of the statute is to provide a minimum amount of recovery, not a maximum. Exclusionary clauses prohibiting the recovery of punitive damages from an uninsured motorist policy have been found to be void and against public policy. Stinbrink v. Farmers Ins. Co., 111 N.M. 179, 180, 803 P.2d 664, 665 (1990). In Stinbrink, the Court considered whether the legislature intended that punitive damages be included in the term "legally entitled to recover" and held that "punitive damages are as much a part of the potential award under the uninsured motorist statute as damages for bodily injury, and therefore they cannot be contracted away." Id. (internal quotation marks, citation, and emphasis omitted).
{17} State Farm, of course, acknowledges these statements but argues that in Dominguez v. Dairyland Insurance Co., 1997-NMCA-065, ¶ 8, 123 N.M. 448, 942 P.2d 191, we noted that uninsured motorist coverage is "`not intended to provide coverage in every uncompensated situation'." (Citation omitted.) In Dominguez, this Court upheld a territorial limitation on uninsured motorist coverage, reasoning that the statute does not preclude such a limitation, and the limitation does not violate the legislative concern to provide protection against "motor vehicle accidents in the state of New Mexico." Id. ¶ 7 (emphasis added, internal quotation marks omitted). In contrast, in State Farm Mutual Automobile Insurance Co. v. Marquez, 2001-NMCA-053, ¶ 3, 130 N.M. 591, 28 P.3d 1132, this Court held that "public policy require[s] that uninsured motorist coverage be territorial[ly] coextensive with liability coverage[ ]" even if the result is coverage for injuries suffered outside the United States. We based our holding in Marquez on the dual premise that the "purpose of Section 66-5-301 is to protect an insured as if the uninsured motorist had liability coverage, and that the amount of uninsured motorist coverage depends on the amount of liability coverage." Marquez, 2001-NMCA-053, ¶ 7, 130 N.M. 591, 28 P.3d 1132 (citation omitted).
*175 {18} Dominguez approved the territorial limitation because this Court found statutory support for it, while Marquez required coextensive coverage voiding a territorial limit because of the stronger public policy aim of protecting insureds as if the uninsured motorist had been insured. In our case, complete statutory silence cannot serve to override the policy goal of protection.
{19} State Farm also argues that Gonzales, 122 N.M. at 142, 921 P.2d at 949 and Wiard v. State Farm Mutual Automobile Insurance Co., 2002-NMCA-073, ¶ 9, 132 N.M. 470, 50 P.3d 565, demonstrate an implicit statutory requirement that coverage depends on bodily injury to an insured. Neither of these cases addresses the question whether bodily injury must be to an insured. Instead, they focus on whether a loss of consortium claim can qualify as a separate bodily injury for policy limit purposes.
{20} Plaintiff in Gonzales sought a declaration that her loss of consortium claim should be considered a separate bodily injury which would bring her claim within the higher "each accident" policy limits rather than providing her with only a single "each person" limit. Gonzales 122 N.M. at 140, 921 P.2d at 947. The Supreme Court held that though Gonzales had a separate cause of action based on her loss of consortium, she was bound to the terms of the insurance policy under which "the relevant contingency [for policy limits purposes] is the number of people who suffered bodily injury." Id. The Court emphasized that loss of consortium is not a bodily injury. Id. Gonzales also argued that denying her a separate source of recovery contravened the public policy of the uninsured motorist statute mandating coverage whenever the insured is "legally entitled to recover damages." Id. at 142, 921 P.2d at 949 (internal quotation marks omitted). The Court held that the insurance policy did not violate the statute since it did not wholly preclude coverage for loss of consortium, but merely limited its liability by treating the claim as part of the damages arising from bodily injury to another. Id. at 143, 921 P.2d at 950. Gonzales simply did not address the question whether an insured must suffer bodily injury to trigger coverage at all.
{21} State Farm also uses Gonzales to emphasize that its policy has been approved by the Superintendent of Insurance indicating that the Superintendent agrees with its interpretation of the Act. Id. at 142, 921 P.2d at 949. The Superintendent's approval does favor State Farm's position. However, our case law makes clear that New Mexico courts are not bound by agency interpretations and may substitute their own independent judgment "because it is the function of the courts to interpret the law." Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995). This is one of those occasions where we find the agency interpretation of the law to be incorrect.
{22} Wiard does not address the issue directly either. Wiard addressed whether a father could make a claim for loss of consortium under his uninsured policy above and beyond the policy limits paid by the tortfeasor for the wrongful death of the insured's daughters. 2002-NMCA-073, ¶ 1, 132 N.M. 470, 50 P.3d 565. We held he could not because his damages were subsumed in the wrongful death payment. Id. ¶ 10. The tortfeasor's payment exceeded the uninsured policy limit and offset any uninsured motorist claim flowing from the daughters' deaths. Id. ¶ 14. Wiard did not address whether the father could have pursued a claim for uninsured coverage if his daughters had not been insureds under his policy.
{23} The issue here boils down to whether the insurance policy trigger requirement of bodily injury to an insured, which necessarily excludes Brian Jr.'s loss of consortium claim, unreasonably diminishes the statutorily mandated coverage. As noted earlier, Section 66-5-301 is silent on the issue. However, our case law tells us that "the only limitations on protection are those specifically set out in the statute itself: that the insured be legally entitled to recover damages and that the negligent driver be uninsured." Schmick, 103 N.M. at 219, 704 P.2d at 1095. Only where the exclusions can be construed to be within the legislature's intent, as in the territorial exclusion in Dominguez, or where a claim is not completely precluded and the limit simply implicates *176 policy limits as in Gonzales, will an exclusion on uninsured motorist coverage be considered valid. Here, State Farm's requirement that bodily injury be to an insured completely precludes damages that Brian Jr.  an insured under the policy (as will be demonstrated later)  may be legally entitled to recover. We conclude that the legislature did not intend to exclude uninsured motorist coverage for insureds such as Brian Jr. We hold that the policy requirement that "bodily injury must be sustained by an insured" is contrary to the statute, and thus unenforceable, in this context.
{24} Our holding is supported by the public policy behind the uninsured motorist statute, which is to compensate those injured through no fault of their own, and to put the insured in the same position he would have been in had the tortfeasor had liability coverage. Schmick, 103 N.M. at 219, 704 P.2d at 1095. Brian Jr. suffered injuries through no fault of his own. In fact, Brian Jr. suffered one of the worst injuries a child can endure  the loss of a parent. If the tortfeasor in this instance, that is, the one responsible for the shooting death of Father, had been insured, Brian Jr. certainly would have had a claim for recovery of damages against the shooter and perhaps his companion. Uninsured motorist coverage is intended to act in the place of a tortfeasor's liability policy, and put victims, such as Brian Jr., in the same position they would have been in if the tortfeasor had coverage. Consistent with the policy behind the statute, Brian Jr. is entitled to pursue a claim under State Farm's uninsured motorist provision in order to put him in the same position he would have been in if the shooter had been insured.
{25} Another public policy at work here is the policy of protecting and providing for our children. A child's need for the law's protection is great. One author noted that "[i]n this age of single parent families many children who lose a parent have no other to guide, comfort and support them on the hazardous road to responsible adulthood. If the wrongdoer who inflicts the loss is not to be held responsible, the cost will be borne by society." Beikmann v. Int'l Playtex, Inc., 658 F.Supp. 255, 258 (D.Colo.1987). The court in Ueland v. Reynolds Metals Co., 103 Wash.2d 131, 691 P.2d 190, 192-93 (1984) (en banc), quoting Prosser, stated "[i]t is not easy to understand and appreciate this reluctance to compensate the child who has been deprived of the care, companionship and education of his mother, or for that matter his father, through the defendant's negligence." W. Prosser, Torts § 125, at 896 (4th ed.1971). Another author stated that "[f]or the state to declare its responsibility to protect and foster the parent-child relationship ... [for example in its children's code], and [then] ignore it when a third party negligently injures the family unit is too anomalous to be countenanced." Reighley v. Int'l Playtex, Inc., 604 F.Supp. 1078, 1083-84 (D.Colo.1985).
{26} Finally, while this is a matter of first impression in New Mexico, our independent research reveals that this exact issue has been decided by a number of other states in the last few years. Not surprisingly, results vary. The two latest cases illustrate the differences well. In Gloe v. Iowa Mutual Insurance Co., 694 N.W.2d 238, 249 (S.D.2005), the Supreme Court of South Dakota held that a policy provision limiting uninsured motorist coverage to bodily injuries suffered by insureds did not violate public policy. In Butterfield v. Norfolk & Dedham Mutual Fire Insurance Co., 860 A.2d 861, 866 (Me.2004), the Maine Supreme Court held that limiting uninsured coverage to bodily injuries sustained by insured violated Maine's uninsured motorist statute. Each case involved claims for damages flowing from bodily injuries suffered by family members who were not insureds under the claimant's policy. Gloe, 694 N.W.2d at 240-41; Butterfield, 860 A.2d at 862. Both courts arrived at their holding after consideration of their respective statutes, their state's public policy goals, and case law from other states. The divergent result cannot be explained by differences in statutory language. While not identical, the South Dakota and Maine uninsured motorist laws are very similar. Gloe, 694 N.W.2d at 243; Butterfield, 860 A.2d at 865 n. 11. The difference in result is better explained by each court's view of the breadth of the public policy expressed in the statute. The court in Gloe repeatedly stated that the purpose of its statute "is to protect the insured *177 party who is injured in an automobile accident." Gloe, 694 N.W.2d at 245. In contrast, the Maine court emphasized the provision of its statute which mandated coverage for persons "who are legally entitled to recover damages" from uninsured motorists. Butterfield, 860 A.2d at 865 n. 11; see also Jack v. Tracy, 722 A.2d 869, 871 (Me.1999) (holding that father could recover wrongful death damages for deceased minor daughter who did not live with him and was not an insured under the policy father was covered by). As a sidelight, it is interesting that the Maine court noted that possibly in reaction to its decision in Jack, insurers began placing in their policies the requirement that bodily injury be suffered by an insured. Butterfield, 860 A.2d at 865.
{27} The purpose of our uninsured motorist statute is to place insured persons in the same position they would be if the uninsured motorist had had insurance. That purpose is akin to the Maine emphasis on an insured's right to recover. New Mexico's purpose is clearly broader than South Dakota's, which taken at face value would preclude coverage for any derivative damages claim including loss of consortium. On balance, it is clear that New Mexico's public policy is much closer to Maine's than South Dakota's. As such, we are in the camp of courts holding that requiring bodily injury to an insured to trigger coverage is contrary to statute.
{28} In sum, it appears that our uninsured motorist act, Section 66-5-301, does not require that there be bodily injury to an insured, but rather that the insured be legally entitled to recover damages from uninsured motorists because of bodily injury or death suffered by a person. Therefore, the State Farm policy exclusion at issue, which limits uninsured motorist coverage to bodily injuries suffered by an insured, unreasonably diminishes the coverage mandated in Section 66-5-301, and is invalid.

2. Can Brian Jr. be deemed an insured under the policy where the event causing his injury occurred when he was a four-week-old fetus?
{29} State Farm argues that because Brian Jr. was a non-viable four-week-old fetus at the time of his injury, he cannot be considered an "insured" under its policy. State Farm's basic argument is that the policy definitional provision requires an insured to be a human being to be covered. Citing cases from a range of legal fields, State Farm asserts that a non-viable fetus is not considered a human being under New Mexico law. State Farm cites Miller v. Kirk, 120 N.M. 654, 655-56, 905 P.2d 194, 195-96 (1995), where the New Mexico Supreme Court held that a non-viable fetus was not a "person" within the meaning of the New Mexico Wrongful Death Act; State v. Willis, 98 N.M. 771, 773, 652 P.2d 1222, 1224 (Ct.App.1982), in which this Court held that a viable fetus is not a "human being" within the meaning of the vehicular homicide statute and also noted that, under the common law, "until born alive there was no human being," id. at 773-74, 652 P.2d at 1224-25 (majority opinion and Wood, J., specially concurring); Salazar v. St. Vincent Hospital, 95 N.M. 150, 153, 619 P.2d 826, 829 (Ct.App.1980), holding that a viable fetus was a "person" within the meaning of the New Mexico Wrongful Death Act; and Neeley v. Union Potash & Chemical Co., 47 N.M. 100, 109, 137 P.2d 312, 317 (1943), stating that a viable fetus falls within the meaning of the term "dependent" under the New Mexico Workers' Compensation Act.
{30} Luebbers concedes that a non-viable fetus that does not survive a prenatal injury has no right of action. But she argues that Brian Jr. survived and lives, thereby rebutting any presumption against viability. Luebbers relies on the Miller Court's observation that "[c]urrently, every jurisdiction allows a right of recovery for prenatal injuries provided the child survives." Miller, 120 N.M. at 656, 905 P.2d at 196. Brian Jr.'s survival does play a role, but it is different than that contemplated by the Miller quote.
{31} New Mexico appellate courts have not addressed specifically the issue of whether a surviving child, injured prenatally, is an insured at the time of his injury. New Mexico has only had occasion to address wrongful death claims for children who died as a result of prenatal injuries. Id.; see also Salazar, *178 95 N.M. at 153, 619 P.2d at 829 (holding that the law in New Mexico recognized viable fetuses as persons at the time New Mexico's Wrongful Death Act was adopted and recognizing a wrongful death claim for the death of a viable fetus). The factual differences between this case and Miller and Salazar are obvious. Miller and Salazar involved fatal bodily injuries suffered by the fetus in utero. Brian Jr. did not suffer a bodily injury, was born alive, and continues to live. Thus, the historical, medical, and legal issues surrounding the legal status of fetuses that gave rise to the issue of viability in Miller and Salazar are not present here.
{32} Brian Jr. seeks recovery for loss of his Father's parental society and consortium. Given the nature of the claim for loss of consortium, Brian Jr.'s injury could only occur and damages accrue after his successful birth and survival. As the Supreme Judicial Court of Massachusetts noted in a case similar to ours:
If the viability of the fetus is not dispositive in cases of prenatal injury when the infant is born alive, then viability should not be dispositive in cases, such as the present one, where the alleged injury occurred after birth. The time in which the fetus became viable has no connection with the injury allegedly suffered by the child. Thus, viability of the fetus at the time of injury to the parent should not be the dispositive issue in separating those children who may recover for loss of consortium from those who may not.
Angelini v. OMD Corp., 410 Mass. 653, 575 N.E.2d 41, 45 (1991). Angelini held that "a child who was (1) conceived before his or her parent suffered non-fatal injuries caused by the negligence of a defendant, and (2) subsequently born alive, is not as matter of law precluded from recovering for loss of parental consortium". Id. at 45-46.
{33} The same concept was recognized by the Ninth Circuit Court of Appeals in Crumpton v. Gates, 947 F.2d 1418 (9th Cir.1991). Crumpton involved a claim by a surviving child under 42 U.S.C. § 1983 for loss of his liberty interest in familial relations with his father. Crumpton, 947 F.2d at 1419. Young Crumpton was a two-month-old fetus when his father was killed by the police. Id. One of the defenses was that Crumpton could not be considered a "person" within the meaning of § 1983 because when the killing occurred he was a non-viable fetus. Crumpton, 947 F.2d at 1420. The Ninth Circuit reasoned that the loss of the liberty interest in familial relations  like loss of consortium  can only be felt after birth when the plaintiff was unquestionably a "person." Id. at 1422-23. Crumpton held that the chid was permitted to recover and his cause of action did not accrue until his birth. Id. at 1423-24.
{34} The facts here present a classic example of a temporal disconnect between a wrongful act and the injury it ultimately causes. See Restatement (Second) of Torts § 433(c) cmt. f (1965) (acknowledging that the mere lapse of time  even if great  is not sufficient by itself to negate a finding of causation). Father was killed while Brian Jr. was in utero. That event could not cause the type of injury contemplated by the notion of loss of consortium. Injury can only occur upon birth. At birth, when the tort was completed (if there was an accident) and the cause of action accrued, Brian Jr. was unquestionably a "human being" living with the named insured within the meaning of the policy.
{35} State Farm might argue  though it has not done so as yet  that Brian Jr.'s cause of action accrued or matured outside the policy period. State Farm's policy provides coverage for "accidents ... that take place during the policy period." The "Policy Period" is the time shown on the declaration page "and is for successive periods of six months each for which you pay the renewal premium." The "accident" clearly occurred during the "Policy Period." Assuming O'Brien properly renewed (which the record does not reflect and we do not assume), Brian Jr. also suffered his injury during the "Policy Period." The record is simply not sufficiently developed with regard to these facts or the proper rule of coverage. We leave this issue for the parties to litigate properly on remand.

*179 3. Is loss of consortium of a parent available to Brian Jr. as a cause of action separate from a wrongful death claim?
{36} Citing Romero v. Byers, 117 N.M. 422, 424, 872 P.2d 840, 842 (1994), and Otero v. City of Albuquerque, 1998-NMCA-137, ¶ 4, 125 N.M. 770, 965 P.2d 354, State Farm suggests that New Mexico has refused to recognize an independent claim for loss of parental consortium, and instead requires that a minor child bring such a claim as part of a wrongful death action. Luebbers argues that because New Mexico has clearly recognized an independent cause of action for loss of spousal consortium, an independent cause of action for a grandmother who lost the companionship of her granddaughter (Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, ¶ 33, 126 N.M. 263, 968 P.2d 774), and even an independent cause of action for those persons not legally married but engaged in a spousal-type relationship (Lozoya v. Sanchez, 2003-NMSC-009, ¶ 31, 133 N.M. 579, 66 P.3d 948), it is reasonable to afford the same right to a child who suffers the loss of a parent. Recently, we held that parents and adult siblings are not legally barred from asserting claims of loss of consortium, but rather such claims are subject to proof as to the quality of the relationship lost. Fitzjerrell v. City of Gallup, 2003-NMCA-125, ¶ 17, 134 N.M. 492, 79 P.3d 836.
{37} Fitzjerrell strengthens Luebbers' argument as to the state and direction of the law of loss of consortium in New Mexico and we hold that upon the death of a parent, a minor child may pursue a separate claim for loss of parental consortium outside of a wrongful death action. Given the development of loss of consortium law in New Mexico, we see no need to dwell at length on the pros and cons of recognizing the claim as such. See Theama v. City of Kenosha, 117 Wis.2d 508, 344 N.W.2d 513 (1984), for a good example of the concerns raised and answered by the courts which recognized the claim, including the common law development of loss of consortium generally and the academic commentary as to loss of parental consortium in particular. New Mexico has covered this ground in rapid succession since Romero, and has concluded that loss of consortium claims have a place in our tort jurisprudence. We have simply not had a case previously which presented the issue squarely as to children losing their parents. This is that case. The more pertinent question now concerns the procedural form of the claim.
{38} Confusion as to the form of a claim for loss of parental consortium stems at least in part from our decision in Otero, 1998-NMCA-137, ¶ 4, 125 N.M. 770, 965 P.2d 354, where we speculated "[p]erhaps [claimant's] separate cause of action is barred by Romero." Despite this speculation, Otero clearly stated: "[t]o avoid any implication to the contrary, we first emphasize that there is one issue of law that we are not deciding on this appeal  the proper procedure for a child to bring a claim of loss of guidance and counseling arising from the wrongful death of a parent." Id. Otero thus does not bar Brian Jr.'s separate cause of action for loss of Father's consortium.
{39} Neither does Romero. The opinion in Romero came out of a consolidated appeal involving two separate cases. One came to the Supreme Court by certiorari and certified question from the Court of Appeals (Romero), and the other came by certified question from the United States District Court in New Mexico (Sears v. Nissan). Romero, 117 N.M. at 424, 872 P.2d at 842. In the Romero portion of the case, the New Mexico Supreme Court considered whether to recognize a claim for loss of spousal consortium, while in the Sears portion of the case, the second question, pertinent here, was the proper measure of damages suffered by minor children from the wrongful death of a parent. Romero, 117 N.M. at 424, 872 P.2d at 842. In response to the Romero question, the Court held that New Mexico would recognize a claim for loss of spousal consortium, and that the loss of consortium claim is a separate cause of action to be brought by the spouse, not to be awarded through the Wrongful Death Act. Id.
{40} In response to the Sears question, the Court pointed out that "[t]he cause of action by a minor child for loss of guidance and counseling has not been considered by this Court, because the basis for the action was *180 seen as rooted in loss of consortium." Romero, 117 N.M. at 428, 872 P.2d at 846. "Our opinion today establishing such a cause of action has opened the door for recognition of loss of guidance and counseling as well." Id. The Court then answered the question posed by Sears concerning a measure of damages which would be consistent with the Wrongful Death Act, but not violate the UJI 13-1830 NMRA stricture that "[i]t is not permissible for you [the jury] to be influenced ... by the loss of the deceased's society to the family." Romero, 117 N.M. at 427, 872 P.2d at 845. Given this posture, we do not believe the Court in Romero limited children to a remedy under the Wrongful Death Act. The Court simply acknowledged the existence of a new specie of pecuniary damage recoverable in wrongful death and answered the question posed in the context of the case presented to it. The Court agreed with other jurisdictions that have "awarded damages for lost guidance and counseling independent of damages for loss of consortium or other losses." Id. at 428, 872 P.2d at 846. Thus, Romero does not bar an independent cause of action for loss of parental consortium as such.
{41} Romero does, however, limit the type of damages Brian Jr. can pursue outside a true wrongful death action. The three-year statute of limitations for filing a wrongful death action elapsed before the current case was filed. NMSA 1978, § 41-2-2 (1961). Historically, New Mexico has applied the wrongful death statute of limitations strictly. Our Supreme Court held, for example, that the prior wrongful death limitations of one year was not affected by operation of the provision extending limitation for the benefit of minors. Natseway v. Jojola, 56 N.M. 793, 797, 251 P.2d 274, 276 (1952), superseded by statute on other grounds as stated in Lujan v. Regents of Univ. of Cal., 69 F.3d 1511 (10th Cir.1995). We recently held that the wrongful death statute of limitation is not subject to any discovery rule of accrual. See Clark v. Lovelace Health Sys., Inc., 2004-NMCA-119, ¶ 15, 136 N.M. 411, 99 P.3d 232.
{42} Given this history, it is clear that Brian Jr. does not have a full-fledged wrongful death measure of damages available to him. He will not be allowed to claim any pecuniary damages connected to Father, including Father's medical expenses, pain and suffering, lost earnings or the value of Father's life. Like the spouse in Kilkenny v. Kenney, 68 N.M. 266, 361 P.2d 149 (1961), superseded by statute on other grounds as stated in Lujan, 69 F.3d 1511, Brian Jr. may bring his loss of consortium claim separately, but his damages are limited to the value to him of the loss of Father's love, care, society, companionship, and the like. See Williams v. Hook, 804 P.2d 1131, 1132 n. 1 (Okla.1990) (defining parental consortium as the love, care, companionship, and guidance given by a parent to a child); Ueland, 691 P.2d at 191 (same).
{43} We acknowledge that fetuses pose a particular problem in the context of loss of parental consortium since the emotional aspect of the parent-child relationship is not allowed to be created if the parent dies before the child's birth. The injury here is the inability to form any parental relationship rather than the loss of an established bond. We do not see this as fatal to the claim. The issue is fundamentally one of factual proof. Plaintiffs such as Brian Jr. have the burden of proving the nature and quality of the relationship lost. Proof will necessarily be different for different children. It could be that Brian Jr. will not be able to muster much admissible evidence as to the type of parent Father was likely to be. As in Fitzjerrell, such a difficulty should not defeat the claim as a matter of law. Id. ¶ 17. It should only affect the potential value of the claim. See Angelini, 575 N.E.2d at 46. Also, we see no way to meaningfully distinguish a parent's pre-birth death from any number of scenarios involving very young infants whose parents  such as military personnel  are killed while away from the home for extended periods of time. Why should a one-week-old infant have a claim as a matter of law, but not a fetus born and surviving? Such a distinction is simply too fine to ensconce as a bright line rule. It is better to allow the fact finder to assess the relative strength of the claims after a full factual hearing.
{44} This approach mirrors the approach adopted by the Supreme Court in Lozoya, in *181 that it allows inquiry into the nature and quality of the relationship to determine whether a claim is compensable rather than relying on the existence of a particular legal relationship as a dividing point. The distinction is that in this case we start with a recognized legal relationship and allow the parties to litigate the value of the claims based on the likely nature of the relationship which was not allowed to come into existence.

CONCLUSION
{45} The judgment is reversed and remanded for further proceedings consistent with this opinion.
{46} IT IS SO ORDERED.
WE CONCUR: LYNN PICKARD and JONATHAN B. SUTIN, Judges.